UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:22-CV-81137-Cannon

JOSHUA BAXTER and SANDRA SUMMERS,
individually and on behalf of all others similarly
situated,

       Plaintiffs,

v.

CROSS COUNTRY HEALTHCARE, INC. and
TRAVEL STAFF, LLC,

       Defendants.

**PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION TO COMPEL ARBITRATION
<u>AND REQUEST FOR JURY TRIAL UNDER THE FEDERAL ARBITRATION ACT</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

I.      INTRODUCTION .................................................................................................... 1

II.     STATEMENT OF FACTS ....................................................................................... 2

III.    THE ARBITRATION AGREEMENT DOES NOT COVER PLAINTIFF BAXTER'S CLAIMS ..................................................................................................... 5

        A.      The arbitration agreement does not apply to Plaintiff Baxter's third employment with Cross Country. .............................................................. 6

                1.      Plaintiff Baxter's first assignment in California did not require execution of any arbitration agreement......................................... 6

                2.      Plaintiff Baxter's second assignment in Texas included an arbitration agreement. ..................................................................... 7

                3.      Plaintiff Baxter did not execute an arbitration agreement in connection with his third assignment for Cross Country in Florida, which is the assignment at issue in this litigation. ........................... 8

        B.      Cross Country's form contract shows that the arbitration agreement is assignment specific. .............................................................................. 9

IV.     THE ARBITRATION AGREEMENTS ARE VOID AND UNENFORCEABLE BECAUSE THERE WAS NO MEETING OF THE MINDS ON THEIR TERMS ........ 10

        A.      While harboring an undisclosed intention to breach its contractual pay obligations to Plaintiffs, Cross Country asks them to sign away their rights to take collective action in a public forum................................... 11

        B.      The "agreements" to arbitrate where not validly formed contracts, as there was no meeting of the minds on their terms. ........................................ 13

V.      THE ARBITRATION AGREEMENT AND ITS DELEGATION PROVISION ARE VOID AND UNENFORCEABLE BECAUSE THEY WERE FRAUDULENTLY INDUCED................................................................................................................ 17

        A.      This Court must decide Plaintiffs' claims that the arbitration agreements and their delegation provisions were fraudulently induced. ................... 18

        B.      Cross Country fraudulently induced Plaintiffs to sign the "agreements" to arbitrate. ............................................................................................. 18

        C.      At a minimum, Plaintiffs are entitled to discovery and a jury trial on the validity of the "agreements" to arbitrate under the Federal Arbitration Act. ....... 23

VI.     CONCLUSION...................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
    24 Cal.4th 83 (Cal. 2000) ................................................................................................. 11, 21

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) .............................................................................................................. 11

*Attix v. Carrington Mortgage Servs.*,
    35 F.4th 1284 (11th Cir. 2022) ......................................................................................... 11, 18

*Bazemore v. Jefferson Capital Sys., LLC*,
    827 F.3d 1325 (11th Cir. 2016) ..................................................................................... passim

*Buckeye Check Cashing v. Cardegna*,
    546 U.S. 440 (2006) ......................................................................................................... 17, 18

*Burch v. P.J. Cheese, Inc.*,
    861 F.3d 1338 (11th Cir. 2017) .............................................................................................. 24

*Business Specialists, Inc. v. Land & Sea Petroleum, Inc.*,
    25 So.3d 693 (Fla. 4th DCA 2010) ........................................................................................ 14

*Butler v. Yusem*,
    44 So.3d 102 (Fla. 2010) ........................................................................................................ 19

*Dahdouh v. Rd. Runner Moving & Storage Inc.*,
    No. 20-CV-61936-RAR, 2020 WL 7481546 (S.D. Fla. Dec. 3, 2020) ................................... 24

*Dahdouh v. Rd. Runner Moving & Storage Inc.*,
    No. 20-CV-61936-RAR, 2020 WL 7480817 (S.D. Fla. Dec. 18, 2020) ................................. 24

*Dasher v. RBC Bank (USA)*,
    745 F.3d 1111 (11th Cir. 2014) .............................................................................................. 13

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
    561 U.S. 287 (2010) ............................................................................................................... 13

*HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*,
    685 So. 2d 1238 (Fla. 1996) ................................................................................................... 23

*In re Annicott Excellence, LLC*,
    259 B.R. 782 (M.D. Fla. 2001) ............................................................................................... 16

*IT Strategies Group, L.L.C. v. Allday Consulting Group, L.L.C.*,
    975 F.Supp.2d 1267 (S.D. Fla. 2013) ..................................................................................... 14

*Jenkins v. First Am. Cash Advance of Georgia, LLC,*
  400 F.3d 868 (11th Cir. 2005) ............................................... 18

*Jimenez v. ViaCord, LLC,*
  No. 21-61805, 2022 WL 4271337 (S.D. Fla. Sept. 15, 2022) ................................... 10

*Johnson v. Davis,*
  480 So.2d 625 (Fla. 1985) ............................................... 19, 22

*JPay, Inc. v. Kobel,*
  904 F.3d 923 (11th Cir. 2018) ............................................... 18

*Kantner v. Boutin,*
  624 So. 2d 779 (Fla. 4th DCA 1993) ............................................... 6

*Kardonick v. Citigroup, Inc.,*
  No. 10-23023, 2012 WL 3594359 (S.D. Fla. Aug. 12, 2012) ................................... 24

*Knapke v. PeopleConnect, Inc.,*
  38 F.4th 824 (9th Cir. 2022) ............................................... 24

*Linafelt v. Bev., Inc.,*
  662 So.2d 986 (Fla. 1st DCA 1995) ............................................... 16

*Martin v. Jack Yanks Construction Co.,*
  650 So.2d 120 (Fla. 3d. DCA 1995) ............................................... 16

*Masias-Pena v. Auto Wax of South Florida, Inc.,*
  No. 19-cv-24559, 2020 WL 874262 (S.D. Fla. Feb. 12, 2020) ................................... 23

*Mejia v. Jurich,*
  781 So.2d 1175 (Fla. 3d. DCA 2001) ............................................... 20

*Muller v. Stromberg Carlson Corp.,*
  427 So.2d 266 (Fla. 2d. DCA 1983) ............................................... 16

*Prieto v. Smook, Inc.,*
  97 So.3d 916 (Fla. 4th DCA 2012) ............................................... 19

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,*
  388 U.S. 395 (1967) ............................................... 18

*QBE Ins. Corp. v. Chalfonte Condominium Apartment Ass'n Inc.,*
  94 So.3d 541 (Fla. 2012) ............................................... 20

*Ramel v. Chasebrook Const. Co.,*
  135 So. 2d 876 (Fla. 2d. DCA 1961) ............................................... 21

*Regency Group, Inc. v. McDaniels*,
  647 So.2d 192 (Fla. 1st DCA 1994) ............................................................................ 5

*Rent-A-Center, West, Inc. v. Jackson*,
  561 U.S. 63 (2010) ...................................................................................................... 18

*Seaboard Coast Line R.R. v. Trailer Train Co.*,
  690 F.2d 1343 (11th Cir.1982) .................................................................................... 5

*Seifert v. U.S. Home Corp.*,
  750 So. 2d 633 (Fla. 1999) .......................................................................................... 5

*TransPetrol, Ltd., v. Radulovic*,
  764 So. 2d 878 (Fla. 4th DCA 2000) .......................................................................... 21

*Woods v. On Baldwin Pond, LLC*,
  634 F. App'x 296 (11th Cir. 2015) ....................................................................... 19, 22

**Statutes**

9 U.S.C. § 4 .................................................................................................................... 24

**Rules**

Fed. R. Civ. P. 56 ..................................................................................................... 17, 23

## I.     INTRODUCTION

Cross Country's motion should be denied for three reasons. First, as to Plaintiff Baxter, the proffered arbitration agreement does not apply to his claims. Indeed, Plaintiff Baxter entered into three separate and distinct fixed-term employment contracts with Cross Country. Each contract related to a specific travel assignment and contained its own set of materials, terms, and conditions. The arbitration agreement proffered by Cross Country relates to Plaintiff Baxter's second fixed-term employment, which is not at issue in this case. Plaintiff Baxter *did not* execute an arbitration agreement in connection with his third travel assignment, which forms the basis of this lawsuit.

Second, the arbitration agreements are void for lack of mutual assent.[1] At the time Cross Country required Plaintiffs to sign the proffered standalone agreements to arbitrate all claims arising out of their employment with the company, it had not yet made them a written offer of employment. Absent a definitive agreement—or even offer—as to the terms of employment, the parties could not have understood the scope of an agreement to arbitrate certain claims arising out of that not-yet-defined employment, nor could they have assessed the sufficiency of the consideration offered. Because there was no "meeting of the minds" as to the essential terms of the arbitration agreement—including its delegation provision—a valid agreement was not formed.

Finally, the arbitration agreements are unenforceable because they were induced by fraud. Plaintiffs were asked to sign a standalone arbitration agreement *before* they entered into employment contracts for their at-issue assignments. At the time Cross Country asked Plaintiffs to agree to arbitration, Cross Country fraudulently concealed the fact that it did not intend to honor their subsequent employment contracts or pay the compensation the parties agreed upon—as was

---

[1] The second and third arguments only apply to Plaintiff Baxter if the Court determines that the proffered arbitration agreement applies to his claims, an application Plaintiffs vigorously contest.

Cross Country's pattern and practice. As Plaintiffs attest, they signed these arbitration agreements with the understanding that Cross Country would, in good faith, attempt to honor any subsequent employment contracts. Had Cross Country disclosed its intention to change their pay rates mid-contract—thus making a dispute arising out of that employment a near certainty—Plaintiffs would not have accepted an arbitration process for their fixed-term employment with Cross Country that permitted Cross Country to shield its improper practices from public view by prohibiting employees from aggregating claims and restricting Plaintiffs' right of access to a public, judicial forum, including their right to have a court determine threshold questions of arbitrability.

For these reasons, Plaintiffs urge the Court to deny the Motion outright. If, however, the Court declines to outright deny the Motion, Plaintiffs have at the very least raised genuine issues of material fact as to the formation of the arbitration agreements, which preclude granting the Motion. In circumstances like this, Section 4 of the Federal Arbitration Act requires the Court to proceed to a jury trial on the issue of contract formation and enforceability. Thus, if at this stage the Court decides that it cannot deny Cross Country's motion in full, Plaintiffs respectfully request limited arbitration-related discovery and a jury trial on the issue of contract formation.

## II.    STATEMENT OF FACTS

Travel nurses serve a valuable role in our country's healthcare system. When a hospital is short-staffed and in need of assistance to provide quality healthcare, particularly when there is a shortage of skilled healthcare workers in their community, they use a staffing agency to hire a travel nurse for a short-term assignment. *See* Doc. 11, First Amended Complaint ("Compl."), ¶ 1. Generally, the hospital is willing to pay a higher hourly rate knowing the assistance will only be temporary and the staffing agency is responsible for providing employment benefits. The all-in rate the hospital is willing to pay is called the "bill rate." The staffing agency working with the

hospital takes its cut and then advertises the amount it is willing to pay to a travel nurse in exchange for short, fixed-term employment. *Id*., ¶ 15.

Travel nursing is a major commitment. To accept a travel assignment, many nurses must give up their current employment, move to the location of the facility (oftentimes out-of-state), secure short-term housing, and incur other travel and housing related costs at their own expense. *Id*., ¶¶ 18, 21, 28. As such, accepting a travel assignment can take weeks or months of preparation. Among other things, it may require filling out forms, securing licensing, passing a physical, getting vaccinations, taking drug tests, satisfying continuing education requirements, and completing training modules. *See* Exhibit 1, Declaration of Joshua Baxter ("Baxter Decl."), at ¶¶ 2–3, 6; Exhibit 2, Declaration of Sandra Summers ("Summers Decl."), at ¶ 3.

Cross Country operates in the healthcare staffing space. It describes itself as "a true market leader" of healthcare staffing agencies that is "dedicated to recruiting and placing highly qualified healthcare professionals in virtually every specialty and area of expertise." Compl., ¶ 14. Plaintiffs Sandra Summers and Joshua Baxter are both travel nurses and former employees of Cross Country. Cross Country offered each of them short, fixed-term employment in connection with accepting an out-of-state travel assignment. *Id*., ¶¶ 19, 26.

For Plaintiff Baxter, Cross Country offered a 13-week assignment at a hospital in Gainesville, Florida that would pay him $102.78 per hour for a minimum of 36 scheduled hours per week, with an overtime rate of $187.31 per hour. The job required him to travel to Florida, secure short-term housing, and forego other employment opportunities. *Id*., ¶¶ 20, 21.

For Plaintiff Summers, Cross Country offered a 13-week assignment at a hospital in Walnut Creek, California that would pay her $76.42 per hour for a minimum of 36 scheduled hours per week, with an overtime rate of $114.53 per hour. The job required her to travel from Baltimore,

3

Maryland to California, secure short-term housing, and forego other employment opportunities. *Id.*, ¶¶ 27, 28.

About five days into his assignment, Cross Country informed Plaintiff Baxter that it was changing the terms of their agreement. Apparently under the auspices of being an "at will" employee, Cross Country demanded that Plaintiff Baxter accept a 20% pay cut or otherwise face immediate termination. *Id.*, ¶ 23. Having already spent substantial time and money securing the assignment and taking the steps necessary to ensure compliance with his obligations under the agreement, and unable to find comparable employment in such a short period of time, Plaintiff Baxter had no choice but to continue working the assignment at the lower rate. *Id.*, ¶ 24.

Plaintiff Summers suffered a similar fate. About one month into her California assignment, Cross Country made Plaintiff Summers a "take-it-or-leave-it" demand to accept a 22% pay reduction or be terminated. *Id.*, ¶ 30. Like Plaintiff Baxter, it was not economically feasible for Plaintiff Summers to walk away from the assignment after picking up and moving across the country, incurring expenses and obligations along the way.[2] *Id.*, ¶ 31.

Unfortunately, Plaintiffs Baxter and Summers are not the only victims of Cross Country's bait-and-switch. Hundreds, if not thousands, of traveling nurses and other healthcare workers employed by Cross Country have reported experiencing similar "take-it-or- leave it" pay cuts in the middle of their fixed-term contracts. *Id.*, ¶ 33; Summers Decl. ¶ 5. Plaintiffs filed suit seeking to put an end to these predatory practices, asserting 11 causes of action against Cross Country and

---

[2] Plaintiffs also assert that Cross Country is violating the Fair Labor Standards Act and various state wage payment laws by underpaying its travel employees for overtime hours work. Plaintiffs allege that Cross Country miscalculated their regular rate of pay by failing to account for stipends and allowances that function as a form of compensation but are not calculated as such. *Id.*, ¶¶ 4, 37–57.

seeking recovery for the pay losses experienced by Plaintiffs and other similarly situated employees. Compl., ¶¶ 59-138.

## III.   THE ARBITRATION AGREEMENT DOES NOT COVER PLAINTIFF BAXTER'S CLAIMS

Cross Country's motion insists that the arbitration agreements "clearly cover all claims." Doc. 21 at 9. But to reach this conclusion, Cross Country's motion omits the key facts establishing that the arbitration agreement does not apply to Plaintiff Baxter's claims. "[T]he determination of whether an arbitration clause requires arbitration of a particular dispute necessarily 'rests on the intent of the parties.'" *Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999) (quoting *Seaboard Coast Line R.R. v. Trailer Train Co.*, 690 F.2d 1343, 1348 (11th Cir.1982)), and citing *Regency Group, Inc. v. McDaniels*, 647 So.2d 192, 193 (Fla. 1st DCA 1994) ("The agreement of the parties determines the issues subject to arbitration.")). "A natural corollary of this rule is that no party may be forced to submit a dispute to arbitration that the party did not intend and agree to arbitrate." *Seifert*, 750 So. 2d at 636. "[T]he determination of whether a particular claim must be submitted to arbitration necessarily depends on the existence of some nexus between the dispute and the contract containing the arbitration clause." *Id*. at 638.

Cross Country's motion incorrectly suggests, among other things, that Plaintiff Baxter only "worked in Florida," Doc. 21 at 2, and that he worked as an employee for Cross Country continuously under one employment contract. *See generally* Doc. 21. In fact, as detailed herein, Plaintiff Baxter entered into three separate and distinct fixed-term employment contracts with Cross Country that each contained their own terms and conditions. The proffered arbitration agreement applied only to Plaintiff Baxter's second assignment with Cross Country, which took place in Texas and ended in July 2021. Plaintiff Baxter did not sign an arbitration agreement

relating to his subsequent travel assignment in Florida that gives rise to this dispute. For this reason, as to Plaintiff Baxter, the Motion should be denied.

    **A.**    **The arbitration agreement does not apply to Plaintiff Baxter's third employment with Cross Country.**

        **1.**    **Plaintiff Baxter's first assignment in California did not require execution of any arbitration agreement.**

On January 15, 2021, Plaintiff Baxter entered into his first fixed-term employment contract with Cross Country for an 8-week travel assignment at PIH Health Hospital in Whittier, California from January 25, 2021 to March 20, 2021.[3] *See* Baxter Decl. ¶ 2, Ex. A. For purposes of this assignment, Plaintiff Baxter was required to execute a contract that included the "terms and conditions" stated in it, as well as the "terms and conditions . . . contained in the Cross Country Nurses Employment Terms and Conditions Booklet."[4] *See* Baxter Decl. ¶ 2, Ex. A. This contract included no reference to or incorporation by reference of any arbitration agreement[5]; however, it did require completion of "required documentation" to perform the assignment, which included various tests, tasks, and forms (*e.g.*, licensing, meal waiver form, *etc.*). *See* Baxter Decl. ¶ 2.

---

[3] Cross Country's motion neither attached this contract nor mentioned any of its terms. Indeed, the Motion referenced only Plaintiffs' purported arbitration agreements, ignoring each of their contracts and the terms in them.

[4] Cross Country never provided the Booklet to Plaintiff Baxter for any of his assignments, despite the fact each of Plaintiff Baxter's contracts expressly reference the Booklet. *See* Baxter Decl. ¶¶ 2, 3, 6. There is no indication that the Booklet includes or references the arbitration agreement. Cross Country's motion does not address this.

[5] "[T]he doctrine [of incorporation by reference] requires that there must be some expression in the incorporating document (as here, [this or any of Plaintiff Baxter's separate employment contracts]) of an intention to be bound by the collateral document (as here, the [arbitration] agreement). A mere reference to another document is not sufficient to incorporate that other document into a contract, particularly where the incorporating document makes no specific reference that it is 'subject to' the collateral document." *Kantner v. Boutin*, 624 So. 2d 779, 781 (Fla. 4th DCA 1993).

Plaintiff Baxter did not complete an arbitration agreement in connection with this assignment. *See* Baxter Decl. ¶ 2, Ex. B (email from Cross Country).

This contract, including these documents—which did not include an arbitration agreement—constituted the terms and conditions of Plaintiff Baxter's first employment with Cross Country, which ended on March 20, 2021.

     **2.    Plaintiff Baxter's second assignment in Texas included an arbitration agreement.**

On March 17, 2021, as his first assignment was ending, Plaintiff Baxter entered into a second fixed-term employment contract with Cross Country for a 13-week travel assignment at University Medical Center in El Paso, Texas starting April 5, 2021 and ending July 5, 2021. *See* Baxter Decl. ¶ 3, Ex. C. Cross Country's motion again virtually ignores this assignment, giving it merely a passing reference in a parenthetical stating, "(and other) assignments." Doc. 21 at 3. But this assignment is important to understanding the limited application of the arbitration agreement.

This contract, like the contract for his first assignment, also included the "terms and conditions" stated in it, as well as the "terms and conditions . . . contained in the Cross Country Nurses Employment Terms and Conditions Booklet." *See* Baxter Decl. ¶ 3, Ex. C. And this contract also required completion of "required documentation" to perform the assignment, but— unlike the contract for the first assignment—this contract required completion of an arbitration agreement (along with other documents including licensing, fit test, drug test, and a background check). *See* Baxter Decl. ¶ 3, Ex. D (email from Cross Country).

This contract, including these documents—which included an arbitration agreement— constituted the terms and conditions of Plaintiff Baxter's second employment with Cross Country, which ended around July 5, 2021. Following completion of this assignment, Plaintiff Baxter accepted employment with another employer—not Cross Country. *See* Baxter Decl. ¶ 5.

**3.      Plaintiff Baxter did not execute an arbitration agreement in connection with his third assignment for Cross Country in Florida, which is the assignment at issue in this litigation.**

Following his time away from Cross Country, in August 2021, Plaintiff Baxter entered into his third fixed-term employment contract with Cross Country for a 13-week travel assignment at UF Health Shands Hospital in Gainesville, Florida. *See* Baxter Decl. ¶ 6, Ex. E; *see also* Baxter Decl. ¶ 7, Exs. F–H. The initial term was from August 30, 2021 to November 27, 2021, which was subsequently extended by the parties to July 9, 2022. *See* Baxter Decl. ¶ 6, Ex. E; *see also* Baxter Decl. ¶ 7, Exs. F–H. Cross Country's motion misleadingly suggests that the arbitration agreement Plaintiff Baxter signed for his Texas assignment on March 25, 2021 applies to his later assignment in Florida. Doc. 21 at 3. Not so. At no point did Plaintiff Baxter sign any arbitration agreement relating to either his first assignment in California or his third assignment (including extensions)—which is the assignment at issue in this litigation—in Florida. Baxter Decl. ¶ 7.

Like the contracts for his first and second assignments, this contract also included the "terms and conditions" stated in it, as well as the "terms and conditions . . . contained in the Cross Country Nurses Employment Terms and Conditions Booklet." *See* Baxter Decl. ¶ 6, Ex. E. And it also required completion of "required documentation" to perform the assignment. But—unlike for his second assignment—the onboarding documents for this assignment did not include any arbitration agreement. *See* Baxter Decl. ¶ 6. Nor did this contract include any reference or incorporation by reference of the previously executed arbitration agreement.[6] As a result, this contract did not include an agreement to arbitrate claims arising from it.

---

[6] *See above* footnote 5.

**B.**     **Cross Country's form contract shows that the arbitration agreement is assignment specific.**

Cross Country's motion fails to acknowledge that the company enters into separate employment contracts for each assignment, that each contract constitutes a separate employment relationship, and that each includes its own terms and conditions, including certain required documentation (*see above* Section III.A.).  If the traveler later contracts to accept a new assignment, Cross Country requires a new contract for each separately entered, numbered, and documented assignment. The terms of previous employment agreements do not survive.

To be sure, Cross Country itself treats each assignment as a separate employment. For example, Cross Country enters into a separate employment contract for each assignment, which includes an option to enroll in certain benefits like 401K and health insurance that only last until the end of the assignment. *See* Baxter Decl. ¶ 8; Summers Decl. ¶ 6. Cross Country itself refers to the employment as "temporary," using terms such as "temporary placement" (Doc. 21 at 2), "temporary staffing contract" (Doc. 21 at 3), "temporary travel nurse" (Doc. 21 at 3), "temporary assignment" (Doc. 21 at 3–4), or "temporary assignments" (Doc. 21 at 4, 6, 8). This nomenclature supports the individual, fixed-term nature of each assignment. Cross Country also numbers each assignment individually, showing again that these are separate, independent, and non-consecutive employment relationships (Plaintiff Baxter's employment numbers were 45683, 51294, and 68620). *See* Baxter Decl. ¶¶ 2–3, 6, Exs. A, C, E; *see also* Summers Decl. ¶ 3. So, while Cross Country insists that the arbitration agreement covers all claims "arising out of or in any way related to [Plaintiff Baxter's] employment," Doc. 21 at 4, it fails to identify the correct employment.

Simply put, each of Plaintiff Baxter's assignments in California, Texas, and Florida were separate employment relationships governed by separate employment contracts comprised of different terms and conditions—only one of which included an arbitration agreement. Cross

Country does not address this fact and, instead, argues implicitly and inaccurately that the arbitration agreement he signed in connection with his second assignment covers every assignment forever into the future. But neither the facts nor the language of the arbitration agreement supports this position. As to the scope of its application, the arbitration agreement merely states (in relevant part) that "binding arbitration shall be the exclusive means of resolving all claims between them, whether or not arising out of or in any way related to Employee's employment with Company or the termination thereof . . . ." Doc 21-2, at 2. Notably, there is no language broadening employment to future or other potential employments or providing for application to multiple assignments, nor can it be reasonably interpreted to mean this given the facts—including Cross Country's own treatment of employment by labeling each employment contract "temporary."

As shown above, Cross Country only required Plaintiff Baxter to sign an arbitration agreement as part of required documentation for his second assignment, which is not at issue in this litigation. As a result, Plaintiff Baxter's claims against Cross Country are not subject to arbitration and, therefore, the Motion should be denied as to him.

## IV.   THE ARBITRATION AGREEMENTS ARE VOID AND UNENFORCEABLE BECAUSE THERE WAS NO MEETING OF THE MINDS ON THEIR TERMS

It is "the party moving to compel arbitration"—here, Cross Country—that "bears the burden of proving" that an arbitration contract "is a valid and enforceable agreement." *Jimenez v. ViaCord, LLC*, No. 21-61805, 2022 WL 4271337, at *2 (S.D. Fla. Sept. 15, 2022) (citing *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1330 (11th Cir. 2016)). And before enforcing a purported agreement to arbitrate a dispute, Section 2 of the Federal Arbitration Act (the "FAA") requires a court to determine whether "there are any 'grounds as exist at law or in equity for the revocation of any contract that 'invalidates the arbitration agreement or permits it to be declared unenforceable.'" *Attix v. Carrington Mortgage Servs.*, 35 F.4th 1284, 1294 (11th Cir. 2022) (citing

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)) (cleaned up). Two such grounds exist here: the "agreements" to arbitrate were void because there was no meeting of the minds on their terms, and they are voidable because they were fraudulently induced.

> **A.**     **While harboring an undisclosed intention to breach its contractual pay obligations to Plaintiffs, Cross Country asks them to sign away their rights to take collective action in a public forum.**

"[A]greements to arbitrate are typically nested within the parties' larger contract, which may involve employment, goods or services, insurance, or another type of transaction." *Attix*, 35 F.4th at 1295. That "typical" arrangement, however, is not how Cross Country proceeded in seeking to secure consent to arbitrate from the Plaintiffs. Rather, prior to even making the at-issue written offers of employment to Plaintiffs, Cross Country asked them to sign standalone agreements to arbitrate "all claims between them, whether or not arising out of or in any way related to Employee's employment" with the company. Doc. 21-1, at 2; Doc. 21-2, at 2.[7] Further, Cross Country asked Plaintiffs—again, before even identifying the consideration therefore or making them a written offer of employment—to agree that "[f]inal and binding arbitration . . . shall be the exclusive remedy" for resolving their covered claims against the company. Doc. 21-1, at 2; Doc. 21-2, at 2; *see also Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 115 (Cal. 2000) ("Moreover, in the case of preemployment arbitration contracts, the economic pressure

---

[7] Plaintiff Summers signed Cross Country's arbitration agreement on March 6, 2022. Doc. 21-2, at 4. This was nearly two weeks before her revised written offer of employment from Cross Country, which Plaintiff Summers both received and executed on March 23, 2022. *See* Compl. ¶¶ 26-28. As to Plaintiff Baxter, and as explained in detail above (*see above* Section III), the record demonstrates that the only arbitration agreement that he signed was on March 25, 2021, which was nearly one year before he signed the at-issue employment contract with Cross Country for the Florida assignment on March 11, 2022. Doc. 21-1, at 4; Compl., ¶¶ 19-21. Therefore, this Court need only reach this argument as to Plaintiff Baxter if it concludes that the arbitration agreement he signed in connection with his second assignment in Texas applies to his third assignment, in Florida.

exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment.").

In addition to requiring binding arbitration of any covered dispute, [8] Cross Country's then-proposed arbitration agreement imposed significant limits on how Plaintiffs could seek redress against Cross Country. First, it required them to waive their right to a "trial by jury or judge," along with "the right to bring, maintain, participate in, or receive money from, any class, collective, or representative proceeding, whether in arbitration or otherwise." Doc. 21-1, at 2; Doc. 21-2, at 2. Further, two provisions of the Agreement would act in concert to entirely shield a covered claim from public view. The first is the provision that seeks to delegate to the arbitrator "exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability of this Agreement" (the "delegation provision"). Doc. 21-1, at 2; Doc. 21-2, at 2. This provision, if validly entered, would deprive a court of the jurisdiction to consider even threshold issues regarding the validity of the Arbitration Agreement. The second is a provision requiring that any mediation or arbitration be treated as "confidential." Doc. 21-1, at 3; Doc. 21-2, at 3.

While the terms of their employments were not yet set, in considering Cross Country's proposed arbitration agreement, the Plaintiffs believed that Cross Country intended, in good faith, to honor its obligations under any employment agreement they subsequently entered. *See* Baxter

---

[8] Covered claims include: "any claim (except a claim that by law is non-arbitrable or that is specifically exempted . . . below) now existing or arising in the future, including but not limited to a claim for: breach of contract; violation of any provision of the state labor and employment laws; unpaid expenses or wages; unpaid compensation or penalties for missed meal or rest breaks; wrongful termination; unfair competition; discrimination, harassment or unlawful retaliation; slander or libel[;] intentional interference with contractual relations or prospective economic advantage; breach of the duty of loyalty; intentional or negligent infliction of emotional distress; conversion; and/or violation of any other federal, state or local statute, ordinance or regulation or constitutional, contract, tort or common law theory." Doc. 21-1, at 2; Doc. 21-2, at 2 (with minor differences).

Decl. ¶ 9; Summers Decl. ¶ 7. Based on that understanding, Plaintiffs executed these agreements without any indication that Cross Country's actions would by design implicate this agreement. *See* Baxter Decl. ¶ 9; Summers Decl. ¶ 7. But while asking the Plaintiffs to commit to binding, final, and confidential arbitration, to forego all right of access to a judicial forum, and to waive the right to bring collective or class proceedings, Cross Country withheld a critical, material fact: Cross Country did not intend, in good faith, to honor its obligations under its subsequent employment contracts with the Plaintiffs. Rather, at the time it was requiring plaintiffs to enter into these standalone dispute resolution provisions, Cross Country had already formulated a pattern and practice of paying its employees less than their contracted-for amount, as it had done with numerous other employees, thus giving rise to a certain material dispute with them. Compl., ¶¶ 33-35; *see also* Summers Decl. ¶ 5. Cross Country never disclosed that intention to the Plaintiffs. Baxter Decl. ¶ 9; Summers Decl. ¶ 7.

      **B.**     **The "agreements" to arbitrate where not validly formed contracts, as there was no meeting of the minds on their terms.**

      While "the FAA creates a 'presumption of arbitrability'" such that "'doubts concerning the *scope* of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to the determination of whether an agreement to arbitrate has been made." *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115-16 (11th Cir. 2014) (citations omitted) (emphasis added); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010). And "[t]he threshold question of whether an arbitration agreement exists at all is 'simply a matter of contract,'" which is governed by the relevant state law; here, that is Florida law. *Bazemore v. Jefferson Capital Sys.*, 827 F.3d at 1329 (citation omitted).[9]

---

[9] Cross Country has its principal place of business in Florida (Compl., ¶ 7) and relied on Florida law in its Motion. *See* Doc. 21 at 7–13.

Under Florida law, "it is axiomatic that a binding and enforceable contract requires 'mutual assent to certain and definitive contractual terms; without a meeting of the minds on all of the essential contract terms, no enforceable contract arises." *IT Strategies Group, L.L.C. v. Allday Consulting Group, L.L.C.*, 975 F.Supp.2d 1267, 1280 (S.D. Fla. 2013). In other words, "[w]hen essential terms are left open for negotiation, there is no meeting of the minds." *Business Specialists, Inc. v. Land & Sea Petroleum, Inc.*, 25 So.3d 693, 695 (Fla.4th Dist. Ct. App. 2010) (citation omitted).

Here, the parties did not form a valid agreement to arbitrate their disputes. That is because the standalone arbitration agreements that Cross Country seeks to enforce against Plaintiffs neither included nor referenced one such set of essential terms, without which there could be no "meeting of the minds": the terms of Plaintiffs' employment. Indeed, the arbitration agreements—which purport to bar Plaintiffs from bringing judicial action on any dispute arising out of their "employment" (Doc. 21-1, at 2; Doc. 21-2, at 2)—were signed *before* Cross Country made Plaintiffs the at-issue written offers of employment. Absent definite information as to the terms of their employment or even a definitive *offer* as to the terms of employment, Plaintiffs and Cross Country's "minds" could not have "met" on the arbitration agreements that purported to set out the dispute resolution process for that yet-undefined employment. In other words, Plaintiffs could not have understood the scope of what they were agreeing to arbitrate, because "employment" had not yet been defined.

For example, Plaintiff Summers was asked to, and did, sign the arbitration agreement on March 6, 2022. Doc. 21-2, at 4. In that "agreement," Cross Country asked her to agree that "binding arbitration shall be the exclusive means of resolving all claims between them, whether or not arising out of or in any way related to Employee's employment." *Id.*, at 2. It then specifies a list

of "Covered Claims," most of which would only arise out of some future, yet-to-be-set employment, including, "breach of contract; violation of any provision of the state labor and employment laws; unpaid expenses or wages; unpaid compensation or penalties for missed meals or rest breaks; wrongful termination; unfair competition'; discrimination, harassment, or wrongful termination." *Id.* But it was not until March 23, 2022, that Cross Country made the revised written offer to Plaintiff Summers that would define the scope and terms of her employment. Compl., ¶ 21. This was the agreement that set terms of employment such as the rate of pay, location and length of employment, and other critical provisions, such as those for meal breaks, overtime pay, and other stipends and allowances. *Id.*

The disparity in timing of the two agreements is even more stark as to Plaintiff Baxter. Cross Country seeks to enforce the arbitration agreement that Baxter signed nearly one year before Cross Country even offered him the at-issue extension of his Florida assignment. Indeed, at the time he signed the arbitration agreement, his Florida assignment was not and could have even been in the Parties' contemplation. *See* Baxter Decl. ¶ 8.

In sum, the terms of the employment were essential to the arbitration agreements, because absent those terms, the scope of what had to be arbitrated could not be clear. This is demonstrated by reference to just one "Covered Claim" under the terms of the arbitration agreement: "breach of contract." Plaintiffs could not have validly assented to arbitrate claims for "breach of contract" that would arise out of a contract that did not yet exist, and whose terms, in fact, had not even been provided in a written offer. As another example, the arbitration agreement asked Plaintiffs to commit to arbitrate disputes arising out of claims for "unpaid expenses or wages," when they had not yet reached agreement as to what those wages were, and what wages and expenses it would cover as part of the employment. This extends to the delegation provision: the parties could not

15

have "met minds" on the issue of delegating authority to the arbitrator to resolve "any dispute relating to the interpretation, applicability, or enforceability of this Agreement" when the scope of the "agreement" was not clear. In other words, the terms of employment *are* essential to the arbitration agreement—and its delegation provision—because they, at least in part, define its scope.

This conclusion naturally flows from well-settled principles of Florida contract law. Under that jurisprudence, for example, "an employment contract will be unenforceable for lack of mutual assent if compensation or the method of determining compensation for the employment is to be negotiated later or is left entirely to the discretion of one of the parties." *In re Annicott Excellence, LLC*, 259 B.R. 782 (M.D. Fla. 2001) (citing *Martin v. Jack Yanks Construction Co*., 650 So.2d 120, 121 (Fla. 3d. DCA 1995)); *see also Muller v. Stromberg Carlson Corp*., 427 So.2d 266, 268 (Fla. 2d. DCA 1983) (adhering to "long established principle[] that an employment contract requires definiteness and certainty in its terms."); *Linafelt v. Bev., Inc*., 662 So.2d 986, 989 (Fla. 1st. DCA 1995) (noting that policy and procedure manual did not qualify as an employment contract without "express reference in the statement to a period of employment and the benefits to accrue therefrom."). Thus, an employment agreement that lacked a key term of employment, such as rate of pay, would be void. Like the rate of pay in an employment agreement, the defined terms of employment are essential to the parties' arbitration agreement, as they serve to define its scope. This is demonstrated by the fact that Plaintiffs are characterized in the arbitration agreement as the "Employee"—which, of course, they were not, at least yet, and certainly not on a continuing basis as defined by Cross Country itself. Doc. 21-2, at 2.

The FAA requires courts to place arbitration agreements "on equal footing with all other contracts." *Buckeye Check Cashing v. Cardegna*, 546 U.S. 440, 443 (2006). To do so means that

this Court may not enforce an agreement that lacks a "meeting of the minds" or "mutual assent," as required by Florida law. At a minimum, Plaintiffs have raised genuine issues of material fact as to whether the arbitration agreements and their delegation provisions were validly formed contracts. *See Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016) (court "may compel arbitration *only* if it concludes that 'there is no genuine dispute as to any material fact'"" as to formation of arbitration agreements) (quoting Fed. R. Civ. P. 56(a)).

## V. THE ARBITRATION AGREEMENT AND ITS DELEGATION PROVISION ARE VOID AND UNENFORCEABLE BECAUSE THEY WERE FRAUDULENTLY INDUCED

Cross Country fraudulently induced each Plaintiffs' purported consent to the arbitration agreement. At the time Plaintiffs were required to sign an arbitration agreement, Cross Country withheld from them a critical and material fact: it did not intend to honor their subsequent employment contracts or pay the compensation the parties agreed upon—as was Cross Country's pattern and practice. And with the undisclosed knowledge that it intended to breach its contractual obligations to them if the opportunity arose, Cross Country asked these Plaintiffs to enter into broad standalone arbitration agreements that severely restricted how, where, and in what format they could seek redress for their future injuries—injuries Cross Country (but not Plaintiffs) knew were nearly certain to occur. As Plaintiffs attest, had Cross Country disclosed that it engaged in a practice of reducing rates of pay mid-contract, they would not have accepted an assignment with Cross Country or entered into an arbitration agreement that so limited their ability to access a public, judicial forum, including by delegating to the arbitrator even the threshold issue of whether the arbitration agreement was enforceable.

**A.      This Court must decide Plaintiffs' claims that the arbitration agreements and their delegation provisions were fraudulently induced.**

"Arbitration is a matter of contract and of consent." *JPay, Inc. v. Kobel*, 904 F.3d 923, 928 (11th Cir. 2018). Thus, while "plac[ing] arbitration agreements on equal footing with all other contracts," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006), the FAA recognizes that an arbitration provision (and its delegation clause) may be defeated by "generally applicable contract defenses," such as, among others, fraudulent inducement. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67-68 (2010).

And where, as here, a party specifically challenges the "making" of the purported "agreement" to arbitrate and its delegation provision, the question of whether Cross Country fraudulently induced Plaintiffs' agreement to those provisions is firmly in the jurisdiction of this Court. *See Jenkins v. First Am. Cash Advance of Georgia, LLC*, 400 F.3d 868, 876-77 (11th Cir. 2005) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967) ("[I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it.")); *Attix v. Carrington Mortgage Servs.*, 35 F.4th 1284, 1294-95 (11th Cir. 2022) ("[A] court must always consider a validity or enforceability challenge that is 'specific' to the delegation agreement before enforcing it.") (citing *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70-71 (2010)).

**B.      Cross Country fraudulently induced Plaintiffs to sign the "agreements" to arbitrate.**

Here, the question is whether Cross Country fraudulently induced Plaintiffs to enter both the standalone arbitration agreement and its delegation provision by withholding from them the material and critical fact that it engaged in a pattern of changing travelers' rates of pay mid-contract. This question is governed by the applicable state law, *see Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016); as noted above, that is Florida law.

18

Under Florida law, "[t]he elements of a claim for fraudulent inducement are: 'a false statement of material fact; (2) the maker of the false statement knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; [and] (4) the party . . . relied on the false statement to its detriment." *Prieto v. Smook, Inc*., 97 So.3d 916, 917 (Fla. 4th DCA 2012); *see also Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010) (finding that the fourth element of a fraudulent misrepresentation claim does not require "justifiable reliance," but simply "injury by the party acting in *reliance* on the misrepresentation.") (emphasis in original). A "false statement of material fact" is not limited to an affirmative misstatement; rather, a material *omission* may satisfy that element. *See Woods v. On Baldwin Pond, LLC*, 634 F. App'x 296, 297–98 (11th Cir. 2015) (recognizing that under Florida law, a claim for "fraudulent inducement" may be "in the form of fraud by omission). That is because where "failure to disclose a material fact is calculated to induce a false belief, the distinction between concealment and affirmative representations is tenuous.'" *Id*. at 298 (quoting *Johnson v. Davis*, 480 So.2d 625, 628 (Fla. 1985)). Both fraudulent statements and omissions "proceed from the same motives and are attended with the same consequences; both are violative of the principles of fair dealings and good faith; both are calculated to produce the same result; and, in fact, both essentially have the same effect." *Woods*, 634 F. App'x at 298 (quoting *Johnson*, 480 So.2d at 628)).

Here, each element of a claim for fraudulent inducement of the arbitration agreement and the delegation provision is satisfied. First, as alleged in the Complaint, while asking Plaintiffs to enter the agreement to arbitrate, Cross Country withheld a critical fact: it routinely reduced its travelers' pay rates mid-contract. *See Mejia v. Jurich*, 781 So.2d 1175, 1177 (Fla. 3d. DCA 2001) ("[I]f the plaintiff can demonstrate that the person promising future action does so with no intention

of performing or with a positive intention not to perform, such a promise may also constitute a fraudulent misrepresentation."). Certainly, and as Plaintiffs attest, the knowledge of this fact would have been material at a time they were considering whether to enter into an agreement that would require them to commit to "binding" and "confidential" arbitration of any claim "arising out of or in any way related to Employee's employment with Company." Baxter Decl. ¶ 9; Summers Decl. ¶ 7.

Indeed, at the time that they signed the arbitration agreements, the Plaintiffs held a reasonable expectation that Cross Country would attempt in good faith to honor its obligations under their subsequent employment agreements. *See QBE Ins. Corp. v. Chalfonte Condominium Apartment Ass'n Inc*., 94 So.3d 541, 548 (Fla. 2012) (noting that "Florida contract law does recognize an implied covenant of good faith and fair dealing in every contract" that is "intended to protect 'the reasonable expectations of the contracting parties in light of their express agreement.'") (citation omitted); *see also* Baxter Decl. ¶ 9; Summers Decl. ¶ 7. That reasonable— and legally supported—expectation naturally informed the Plaintiffs' decision as to whether to enter into a dispute resolution agreement that would impose serious restrictions on how and where they may seek redress for their injuries, including, via the delegation provision, by attempting to entirely deprive them of any access to a public forum. Baxter Decl. ¶ 9; Summers Decl. ¶ 7.

In other words, knowledge that a dispute with their employer was a substantial likelihood, rather than a mere possibility, would have been material to Plaintiffs' consideration of Cross Country's offered dispute resolution provisions. *See id*. This is because "[w]hile arbitration may have its advantages in terms of greater expedition, informality, and lower cost, it also has, from the employee's point of view, potential disadvantages: waiver of a right to a jury trial, limited discovery, and limited judicial review." *Armendariz v. Found. Health Psychcare Servs., Inc*., 24

Cal. 4th 83, 115 (Cal. 2000). Further, "[v]arious studies show that arbitration is advantageous to employers not only because it reduces the cost of litigation, but also because it reduces the size of the award that an employee is likely to get, particularly if the employer is a 'repeat player' in the arbitration system." *Id.* (citing Bingham, *Employment Arbitration: The Repeat Player Effect* (1997) 1 Employee Rts. & Employment Policy J. 189). This is particularly true where many other Cross Country employees were being victimized by the same practice, which Plaintiffs could not have known at the time the arbitration agreement was presented.

In fact, Plaintiffs attest that had they known of Cross Country's undisclosed intention to change their pay rates mid-contract—thus giving rise to a certain material dispute under the terms of their employment agreement—they would not have entered into arbitration agreements (or its delegation provisions) that so restricted how and where they could seek redress for their injuries. Baxter Decl. ¶ 9; Summers Decl. ¶ 7. And because Cross Country was in sole possession of knowledge as to its (lack of) intention to perform under its future employment contracts—and that knowledge was indisputably relevant to Plaintiffs' consideration of an arbitration provision that would require them to confidentially and individually arbitrate all disputes "arising out of or in any way related to Employee's employment" with the company—it was obligated to disclose that information to Plaintiffs. *See TransPetrol, Ltd., v. Radulovic*, 764 So. 2d 878, 880 (Fla. 4th DCA 2000) (noting that "an action for fraud exists where one party has superior knowledge and intentionally fails to disclose a material fact"); *Ramel v. Chasebrook Const. Co.,* 135 So. 2d 876, 882 (Fla. 2d. DCA 1961) ("nondisclosure of a material fact may be deemed fraudulent where the other party does not have equal opportunity to become apprised of the fact.").

The second element of a fraudulent inducement claim is that the maker of the false statement knew or should have known of the falsity of the statement. Where, as here, the fraudulent

inducement claim is premised on a material omission rather than an affirmative statement, this element requires that the omitted fact was "calculated to induce a false belief." *Woods*, 634 F. App'x at 298 (quoting *Johnson*, 480 So.2d at 628). That is satisfied here. In their First Amended Complaint, Plaintiffs specifically allege that Cross Country knowingly engaged in coercive "bait-and-switch" tactics, and that it did not intend to honor its pay obligations under the Plaintiffs' contracts. *See* Compl. ¶¶ 3, 33–35 ("Cross Country is knowingly engaging in these coercive 'bait-and-switch practices to maintain the significant profit margins it had become accustomed to during the COVID-19 pandemic."). In asking Plaintiffs to sign its arbitration agreements, Cross Country knew that they would hold a reasonable, legally supported belief that it would attempt in good faith to honor their subsequent employment agreements, and that that belief was relevant to their consideration of its restrictive dispute resolution provision. But despite knowing that Plaintiffs' belief was false, Cross Country did not correct their understanding. Its omission was therefore calculated to induce a false belief.

As to the third and fourth elements of a fraudulent inducement claim, Cross Country intended for the Plaintiffs to rely on this false omission, and the Plaintiffs reasonably did so. First, that Cross Country intended to induce reliance is supported by the evidentiary record. The record thus far shows that Cross Country asked the Plaintiffs to enter into the arbitration agreement *before* it had even made them a written offer of employment. This eagerness to secure a sweeping arbitration agreement even before it had made a firm *offer* of employment demonstrates the importance of the arbitration agreement to the company in shielding its intended contract breaches from public view and in isolating and insulating its employees' claims from one another.

And as Plaintiffs attest, they *did* rely on Cross Country's material omission. Had they known that Cross Country engaged in a practice of changing their and others' pay rates mid-

contract, they would not have agreed to an arbitration agreement that entirely deprived them of access to a public, judicial forum, including by delegating threshold issues of arbitrability to the arbitrator. Baxter Decl. ¶ 9; Summers Decl. ¶ 7.

Therefore, Cross Country fraudulently induced Plaintiffs to sign both the arbitration agreement and its delegation provision, so those agreements are not enforceable. *See HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1240 (Fla. 1996) ("'Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely ... but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior.'") (citation omitted). At a minimum, Cross Country has not met its burden of demonstrating the existence of valid and enforceable agreements to arbitrate with Plaintiffs. *See Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1330 (11th Cir. 2016) (citation omitted).

### C.      At a minimum, Plaintiffs are entitled to discovery and a jury trial on the validity of the "agreements" to arbitrate under the Federal Arbitration Act.

This Court may compel arbitration *only* if it concludes that "'there is *no* genuine dispute as to any material fact'" as to whether the arbitration agreements and their delegation provisions were validly formed. *See Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). Plaintiffs contend their attestations are sufficient to establish they were fraudulently induced to sign the arbitration agreements and their delegation provisions, warranting denial of the motion to compel arbitration. At a minimum, however, Plaintiffs' attestations raise a genuine issue of material fact as to the validity of the arbitration agreements and their delegation provisions. *See, e.g., Masias-Pena v. Auto Wax of South Florida, Inc*., No. 19-cv-24559, 2020 WL 874262, at *2 (S.D. Fla. Feb. 12, 2020) (finding that Plaintiffs' affidavits attesting that they did not sign the arbitration agreements created a "genuine issue" as to whether

they had agreed to arbitrate); *Dahdouh v. Rd. Runner Moving & Storage Inc*., No. 20-CV-61936-RAR, 2020 WL 7481546, at *1 (S.D. Fla. Dec. 3, 2020) (recommending a jury trial pursuant to 9 U.S.C. § 4 where Plaintiffs' affidavits raised a genuine issue of material fact as whether they had agreed to arbitration provision, and resolution of that issue "will ultimately turn on a credibility determination") (R&R adopted in full at 2020 WL 7480817, at *1 (S.D. Fla. Dec. 18, 2020)).

Section 4 of the FAA provides that "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. Thus, in the event the Court declines to outright deny the motion to compel arbitration at this stage, Plaintiffs respectfully request limited arbitration-related discovery, and, if necessary, a jury trial on the issue of contract formation, as required by the FAA. *See, e.g.*, *Knapke v. PeopleConnect, Inc*., 38 F.4th 824, 833 (9th Cir. 2022) ("[T]he FAA's procedure mirrors the three phases of federal civil lawsuits: a motion to compel arbitration akin to a motion to dismiss; followed by optional discovery before summary judgment; if the motion is denied; followed by a mini-trial, if necessary."); *Burch v. P.J. Cheese, Inc*., 861 F.3d 1338, 1347 (11th Cir. 2017) ("[B]ecause [plaintiff's] denial put the making of the arbitration agreement at issue, he had a statutory right under 9 U.S.C. § 4 to try that disputed issue to a jury").

Specifically, Plaintiffs request 60 days to pursue limited arbitration-related discovery and, should factual issues persist after discovery, a jury trial shortly thereafter. *See, e.g*., *Kardonick v. Citigroup, Inc*., No. 10-23023, 2012 WL 3594359, at *2 (S.D. Fla. Aug. 12, 2012) (after denying motion to compel arbitration, granting motion to conduct limited arbitration-related discovery and setting schedule for same).

## VI.    CONCLUSION

For the reasons set forth herein, Defendants' motion should be denied in full.

Dated: October 7, 2022     Respectfully submitted:

**SHAVITZ LAW GROUP, P.A.**

*/s/ Gregg I. Shavitz*
Gregg I. Shavitz
Fla. Bar No. 11398
gshavitz@shavitlzlaw.com
Alan L. Quiles
Fla. Bar No. 62431
aquiles@shavitzlaw.com
SHAVITZ LAW GROUP, P.A.
951 Yamato Road, Suite 285
Boca Raton, Florida 33431
Tel: (561) 447-8888
Fax: (561) 447-8831

**STUEVE SIEGEL HANSON LLP**
J. Austin Moore*
Alexander T. Ricke*
K. Ross Merrill*
* Admitted *pro hac vice*
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
Facsimile: (816) 714-7101
moore@stuevesiegel.com
ricke@stuevesiegel.com
merrill@stuevesiegel.com

***Attorneys for Plaintiffs and the Putative Class and Collective***

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on October 7, 2022, the foregoing was electronically

filed with the Clerk of the Court using the CM/ECF system which sends notification of such filing

to all counsel of record.


                    *s/ Gregg I. Shavitz*

                    Gregg I. Shavitz